No. 100,997

FRIENDS OF BETHANY PLACE, INC., *Appellee*, v. CITY OF TOPEKA, *Appellant*, and GRACE CATHEDRAL and THE EPISCOPAL DIOCESE OF KANSAS, INC., *Intervenors/Appellants*.

(307 P.3d 1255)

Opinion filed August 23, 2013.

*Shelly T. Starr*, assistant city attorney, argued the cause, and *Eric B. Smith*, assistant city attorney, *Mary Beth Murdock*, chief of litigation, and *Jackie Williams*, city attorney, were on the briefs for appellant City of Topeka.

*Nathan D. Leadstrom*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, argued the cause, and *H. Philip Elwood*, of the same firm, was with him on the briefs for intervenors/appellants Grace Cathedral and The Episcopal Diocese of Kansas, Inc.

*Pedro L. Irigonegaray*, of Irigonegaray & Associates, of Topeka, argued the cause, and *Shelley Hickman Clark*, of University of Kansas School of Law, of Lawrence, was with him on the briefs for appellee Friends of Bethany Place, Inc.

*Sandra Jacquot*, general counsel, and *Donald L. Moler, Jr.*, executive director, of League of Kansas Municipalities, of Topeka, were on the brief for *amicus curiae* League of Kansas Municipalities.

*Derenda J. Mitchell* and *Michael J. Smith*, assistant attorneys general, and *Steve Six*, attorney general, were on the brief for *amicus curiae* Kansas State Historical Society.

The opinion of the court was delivered by

BILES, J.: The Topeka City Council granted Grace Episcopal Cathedral and The Episcopal Diocese of Kansas, Inc. (the Church) a building permit for a parking lot on Bethany Place, a registered state historic site owned by the Church, despite complaints that the construction would adversely impact that historic site. As a matter of first impression, we must determine who is obligated under the Historic Preservation Act, K.S.A. 75-2715 *et seq.*, to establish that (1) there are no feasible and prudent alternatives to the project and (2) the project program includes all possible planning to minimize harm to the historic property as required by K.S.A. 2012 Supp. 75-2724(a)(1).

We hold that the governing body—in this case the Council—must make those determinations and that it failed in its statutory responsibility to obtain the information necessary to discharge its duties. We hold further that the Council did not take what the caselaw characterizes as a "hard look" at all relevant factors that must be reviewed before authorizing a project that encroaches upon, damages, or destroys historic property. And because the proceedings below did not follow this rubric, we reverse and remand for a rehearing after the Council makes the proper inquiries. We also reject and overrule the Court of Appeals' analysis in *Allen Realty, Inc. v. City of Lawrence*, 14 Kan. App. 2d 361, 790 P.2d 948 (1990), which purports to place the burden of proof in these matters on the project's proponent.

## FACTUAL AND PROCEDURAL BACKGROUND

The Church owns land known as Bethany Place at 833-835 Polk

in Topeka. The site is included on the Register of Historic Kansas Places, which is a designation that shields Bethany Place from further development unless the statutory protections within the Historic Preservation Act are satisfied. The Church's cathedral building and current 89-space parking lot are adjacent to Bethany Place but are not considered part of the historic site. The property is in a residential neighborhood next to Topeka High School.

In 2007, the Church requested a city building permit for a parking lot on Bethany Place along Polk Street. The proposed project includes 10 handicap and 33 standard parking stalls. A Church representative testified at a Council hearing that the Church was "critically short of disabled access space" and estimated its true parking needs at 194 spaces. The work proposed included not only the removal of trees and shrubs, but also the laying of a parking lot across what was formerly some of the historic site's green space.

As required by K.S.A. 2012 Supp. 75-2724(a), the State Historic Preservation Officer (SHPO) was notified of the permit request and given an opportunity to investigate and comment. In the SHPO's first letter to the Topeka Planning Department, the SHPO concluded the parking lot would encroach upon, damage, or destroy the Bethany Place site and noted further that the project would "require the demolition of several historic trees that characterize the property." The SHPO concluded the construction "drastically changes the relationship between the two historic buildings on the site with the public street of Polk." The SHPO recommended altering the project to take advantage of the City of Topeka's right-of-way by designing parking stalls directly adjacent to Polk Street and possibly 8th Street if needed.

The day after receiving the SHPO's letter, the Topeka Planning Department submitted its own letter recommending that the Council deny the building permit "in light of alternative and feasible alternatives that will not encroach upon or damage the listed property." The Planning Department cited the SHPO's determination that the parking lot would encroach on Bethany Place and also the Topeka Traffic Engineering Division's determination that "angled 'cut-back' parking along SW Polk Street, adjacent to the Bethany Place property[,] would be a feasible alternative to the

proposed parking lot." Notably, the Planning Department's letter contained no additional information detailing economic, technical, or design issues related to its recommendation to add angled cutback parking. See K.A.R. 118-3-1(e) (listing factors to consider when determining whether there are feasible and prudent alternatives). The appellate record does not contain a report from the Traffic Engineering Division.

The Church asked the SHPO to reconsider its findings. It also attacked those findings and requested that the Council issue the permit anyway. The matter was scheduled for hearing at an August Council meeting.

In a second letter to the Planning Department prompted by the request for reconsideration, the SHPO provided a more detailed analysis and reached the same conclusion that the proposed project would encroach upon, damage, or destroy Bethany Place. But the Planning Department staff decided not to forward this second SHPO letter to the Council, although some of its contents were referred to during the hearing.

One day before the hearing, a nonprofit organization, Friends of Bethany Place, Inc. (FOB), was formed to oppose the project.

*The City Council Hearing*

In preparation for the scheduled hearing, City personnel submitted to the Council: (1) the Topeka Planning Department's letter; (2) the SHPO's first letter; and (3) an e-mail from the City forester describing trees that would need to be removed. A City representative did not address the Council at the hearing.

The Church submitted the following additional documents: (1) a description of the buildings on Bethany Place; (2) the Church's 1983 plans for a conference center on Bethany Place, which was never built due to funding issues, along with a letter written at the time from the SHPO approving that project; (3) an engineering report comparing the cost of 40 parking spaces made from asphaltic concrete with the cost if made of Portland concrete; and (4) an engineering report describing the total area owned by the Church and the percentage to be occupied by the proposed parking lot.

FOB submitted: (1) a petition containing 95 electronic signatures predominately from persons opposed to the project; (2) documents explaining Bethany Place's historical significance; (3) a copy of statutes from the Historic Preservation Act; (4) the Topeka Historic Old Town Neighborhood Plan, which emphasized promoting the neighborhood's historic character; (5) a document entitled "alternative parking lot sites" containing an aerial photograph of the Church grounds with three notes suggesting the use of vacant lots on 8th Street and angled cut-back parking along 8th and Polk Streets; and (6) letters urging the permit's denial.

A letter by FOB to the Council represented that the Topeka Landmarks Commission, created by Topeka Municipal Code Ordinance 2.60.010 to advise the Council on local historical assets, concluded "there are alternative feasible options." But again, there is no direct evidence in the record that the Topeka Landmarks Commission provided any information to the Council establishing what these alternatives were or what information the commission had that might demonstrate their feasibility.

In addition to the angled cut-back parking along Polk Street recommended by the City's Traffic Engineering Division and Planning Department, FOB advocated expanding handicap parking in the existing west lot and adding parking spaces directly east of the Church, with care given to existing trees. FOB also recommended reconfiguring an existing lot to create five additional accessible parking spots, expanding parking along 8th and Polk Streets, where the Church currently had a circle drive, and converting two nearby vacant Church-owned lots for parking.

Another letter opposing the project was submitted by the former president of the Shawnee County Historical Society, which described how the City developed a neighborhood plan emphasizing a need for green space. This letter referenced a previous Council determination denying a construction permit for parking just east of Grace Cathedral on 8th Street because it contradicted the neighborhood plan. The only additional alternative from those already described was a suggestion to convert the Church's current surface parking lot into a parking garage. Church representatives presented reasons why they did not believe any suggested alternative was

feasible or prudent and argued that all possible planning had been done to minimize harm to Bethany Place.

The proposed permit was hotly disputed during the hearing. Hearing testimony is summarized at length in the Court of Appeals decision, *Friends of Bethany Place v. City of Topeka*, 43 Kan. App. 2d 182, 187-93, 222 P.3d 535 (2010). When the testimony concluded, the Council unanimously passed the following motion, as stated by a Councilmember:

"I'd like to make a motion to approve the communication to override the recommendation of the [SHPO] and issue the parking lot permit.

"I base this on the City Council's consideration of all relevant factors, that there are no feasible and prudent alternatives of the proposal, and that all possible planning has been undertaken to minimize harm to the historic property."

The next day, FOB appealed to the district court under K.S.A. 2012 Supp. 75-2724 and K.S.A. 60-2101(d).

*District Court Proceedings*

The City filed a motion to dismiss FOB's appeal, arguing the organization lacked standing. FOB opposed the motion, arguing it was a "person aggrieved" by the Council's determination under the terminology stated in K.S.A. 2012 Supp. 75-2724 and, therefore, entitled to seek judicial review of the Council's decision. FOB attached numerous affidavits from members claiming either an economic or aesthetic interest in the historic property.

The district court found FOB had standing to appeal the decision to issue the permit. It held that the Historic Preservation Act's broad preamble of legislative purpose stated in K.S.A. 2012 Supp. 75-2715 and the Act's provisions enabling the SHPO to hold a public meeting on the project suggested there was an "obviously apparent" local purpose to the statutory requirements. Construing the term "person aggrieved," the district court further held that the Act created a special category of "justiciable" interest that expanded upon traditional standing requirements that a person have a pecuniary or personal interest to bring an appeal. It also noted historic preservationists generally might be the only public oversight to the governmental process authorizing construction at historic locations.

As to the merits, the district court defined the issues as: (1) whether the Council's ruling was legally adequate to support judicial review; (2) whether the record supported the Council's decision; and (3) whether the decision was limited or tainted by the format or evidentiary considerations or limitations, including any legal misperceptions as to the Council's authority and scope of review or those that might arise because the permit applicants were religious entities. It reversed the Council's decision and ordered the parking lot permit set aside.

The district court also held the record was insufficient to support the Council's findings that there were no feasible and prudent alternatives to the project and that all possible planning to minimize harm had been undertaken. The district court noted the Council appeared to consider proposed alternatives individually instead of examining whether several alternatives could be combined to satisfy the Church's parking needs. Therefore, the district court concluded the Council's decision did not satisfy the "hard look" test required by this court in *Reiter v. City of Beloit*, 263 Kan. 74, 94, 947 P.2d 425 (1997) ("[T]he ultimate question for appellate review [under K.S.A. 75-2724] is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence."). The City and Church appealed the district court's decision.

*The Court of Appeals Decision*

The Court of Appeals panel first addressed FOB's standing and unanimously agreed with the district court that the organization could pursue the appeal on its members' behalf. *Friends of Bethany Place*, 43 Kan. App. 2d at 201. The panel based its holding on this court's decision in *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, Syl. ¶ 7, 189 P.3d 494 (2008) (An association has standing to sue on behalf of its members when: [1] the members have standing to sue individually; [2] the interest the association seeks to protect are germane to its purpose; and [3] neither the claim asserted nor the relief requested requires individual member participation.). The panel determined from the record that at least two FOB members had individual standing to

pursue an appeal based on their claims of injury to their properties, which were in close proximity to the project, as a result of the claimed lost historic and aesthetic value of Bethany Place. The panel noted these injuries were particularized to those individuals based on the facts and circumstances and were not injuries simply shared by all other Topeka citizens. It then found FOB's organizational purpose was to maintain Bethany Place in its present form, which was an interest compatible with the claimed injuries of FOB members and the relief sought. 43 Kan. App. 2d at 200-01. But on the merits, the panel was divided as to whether the Council's decision was lawful.

The panel majority agreed with the Church and City, reversed the district court, and upheld the permit's issuance. It held none of the proposed alternatives needed to be considered by the Council as relevant factors because there was insufficient evidence to characterize them as anything more than mere suggestions. 43 Kan. App. 2d at 209. And based on that decision, the majority held there was substantial evidence supporting the Council's decision that there were no reasonable and prudent alternatives and that all possible planning to minimize harm had been undertaken. 43 Kan. App. 2d at 209-10. The panel majority further concluded the district court improperly reweighed the evidence in order to find the evidence insufficient. 43 Kan. App. 2d at 210-11.

Judge Richard Greene dissented, arguing the majority oversimplified the analysis when it held there was substantial supporting evidence and failed to determine whether the Council acted arbitrarily or capriciously. 43 Kan. App. 2d at 220. He concluded that the majority's standard was too high for determining whether alternatives presented by project opponents were sufficient to warrant consideration and shifted the burden of proving there were no acceptable alternatives from the project proponent to the opponents. Judge Greene also argued the Council's permit authorization was arbitrary, capricious, and unreasonable. 43 Kan. App. 2d at 221-26.

FOB petitioned this court for review, arguing in part that the majority erred in finding the district court reweighed evidence and that there was substantial evidence supporting the Council's de-

termination. Neither the Church nor the City pursued a cross-petition for review; but, in its response brief to FOB's petition, the Church asked this court to address the standing and First Amendment issues raised below.

The Church's failure to cross-petition for review of its First Amendment claim precludes consideration of that question. See Supreme Court Rule 8.03(c)(3) (2012 Kan. Ct. R. Annot. 72); see also *Shirley v. Smith*, 261 Kan. 685, 697, 933 P.2d 651 (1997) (interplay between Rule 8.03[c] and [g]). We further note the legislature recently amended K.S.A. 2012 Supp. 75-2724, effective July 1, 2013. L. 2013, ch. 129, sec. 4. Neither party has argued this recent enactment impacts our review of the prior proceedings and, as noted below, the revisions may not impact the issues needing to be considered on remand.

Our jurisdiction arises from K.S.A. 20-3018(b) (review of Court of Appeals decision). We obtain jurisdiction under K.S.A. 60-2101(b).

### FOB's Standing to Appeal

Although the First Amendment claim may not be considered because the Church failed to cross-petition for review on that question, the challenge as to standing is different because it relates to the court's subject matter jurisdiction. See *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005) (objection based on subject matter jurisdiction may be raised at any time, including for the first time on appeal, and upon the court's own motion). Standing requires a court to determine whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on that plaintiff's behalf. *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, Syl. ¶ 1, 249 P.3d 434 (2011). The existence of jurisdiction and standing are both questions of law over which an appellate court's scope of review is unlimited. 291 Kan. at 903. To establish standing, FOB must meet both the statutory requirements set out in K.S.A. 2012 Supp. 75-2724(b) of the Historic Preservation Act, as well as the

traditional tests for associational standing by an organization set out in Kansas caselaw. See *Bremby*, 286 Kan. at 750.

In this case, the district court's only consideration of the standing question was in its order denying the City's motion to dismiss. The question of standing and the factual basis alleged by FOB in its opposition to the motion were never revisited in the district court. The record reflects there was no evidentiary hearing. In *Aeroflex Wichita, Inc. v. Filardo*, 294 Kan. 258, 267-70, 275 P.3d 869 (2012), we held that when a motion to dismiss for lack of personal jurisdiction is decided before trial on the basis of pleadings, affidavits, and other written materials without an evidentiary hearing, any factual disputes must be resolved in the plaintiff's favor and the plaintiff need only make a prima facie showing of jurisdiction. Standing, of course, is a question of subject matter jurisdiction, but we see no basis for an analytical distinction in how an appellate court should review a district court's order on a motion to dismiss based on standing from one regarding personal jurisdiction. We note also the City and Church on appeal do not dispute the factual accuracy of the affidavits, so we accept both the facts asserted and the inferences to be drawn from them on the basis of this record. See *Cochran*, 291 Kan. at 903; *Bremby*, 286 Kan. at 751.

We begin with whether standing exists under the statute.

*Statutory Standing*

K.S.A. 2012 Supp. 75-2724(b) provides that "[a]ny *person aggrieved* by the determination of a governing body pursuant to this section may seek review of such determination in accordance with K.S.A. 60-2101 and amendments thereto." (Emphasis added.) The Act's definitional section defines "person" as "any individual, firm, association, organization, partnership, business, trust, corporation or company." K.S.A. 2012 Supp. 75-2716(d). FOB clearly falls within this definition of "person." But the City and Church challenge whether FOB is "aggrieved," which is a term not defined by the Act. This is a question of statutory interpretation subject to unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). It also is a question of first impression as it pertains to the Historic Preservation Act.

The most fundamental rule of statutory construction is that legislative intent governs if it is ascertainable. Accordingly, courts "need not resort to statutory construction" if a statute's language is plain and unambiguous. *Bremby*, 286 Kan. at 754. But if the statutory language is subject to multiple interpretations, a reviewing court " 'may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested.' [Citation omitted.]" 286 Kan. at 754 (quoting *Robinett v. The Haskell Co.*, 270 Kan. 95, 100-01, 12 P.3d 411 [2000]). In doing so, we must construe statutes to avoid unreasonable results and presume the legislature does not intend to enact useless or meaningless legislation. When construing statutes to determine legislative intent, appellate courts consider various provisions within an act in pari materia with a view to reconciling and bringing those provisions into workable harmony if possible. *Bremby*, 286 Kan. at 754-55.

The Church urges us to define aggrieved party in the same way the Court of Appeals did in *Linsea v. Board of Chase County Comm'rs*, 12 Kan. App. 2d 657, 753 P.2d 1292, *rev. denied* 243 Kan. 779 (1988). In that case, the panel was asked to define the term under K.S.A. 19-223, the statute for appealing a county commission's decision by "any person who shall be aggrieved" by such decision to the district court, as follows:

"An aggrieved person is one whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected. [Citation omitted.]" 12 Kan. App. 2d 657, Syl. ¶ 4.

The Church argues these requirements, if applicable, are not met because FOB lacks a pecuniary interest in the dispute's outcome. But our review of the Historic Preservation Act demonstrates the legislature intended for K.S.A. 2012 Supp. 75-2724(b) to confer broader standing than the statute at issue in *Linsea*.

K.S.A. 2012 Supp. 75-2715 sets out the Act's context by stating that the legislature "hereby finds" the historical, architectural, archeological, and cultural heritage of Kansas "is an important asset of the state and that its preservation and maintenance should be among the highest priorities of government." And the statute further declares it is the public policy of Kansas and in the public interest "to engage in a comprehensive program of historic preservation and to foster and promote the conservation and use of historic property for the education, inspiration, pleasure and enrichment of the citizens of Kansas." In this way, the legislature has expressed the significance to be given these protections for our state's historic locations.

More directly relevant to standing, the Act contains two provisions placing particular emphasis on landowners within 500 feet of a historic property. First, K.S.A. 2012 Supp. 75-2720(b) prohibits the state Historic Sites Board of Review from approving any nomination of historic property "unless owners of land located within 500 feet of the boundaries of a proposed historic property have been notified of the time and place of the board meeting at which such nomination is to be considered or approved." Second, K.S.A. 2012 Supp. 75-2724(a) requires notice to the SHPO when a proposed project "is located within 500 feet of the boundaries of a historic property located within the corporate limits of a city." Both provisions confer special consideration to property owners living within 500 feet of a historic site or a proposed historic site, and this consideration denotes a statutory identification that is distinct from others who are outside those boundaries.

The record shows some FOB members live within 500 feet of Bethany Place. And while we acknowledge the dissent's point that these provisions should not by themselves establish standing for a property owner or resident within this statutory 500-foot zone, these provisions must be viewed as legislative awareness that certain actions—such as historic site designations or modifications to property—may affect property within that zone. In this case, the claim that falls within this legislative recognition is that modifications to an existing historic site will impinge upon nearby properties

within the zone by adversely affecting the historical, architectural, archeological, or cultural integrity of that historic site.

In response to the Church's motion to dismiss based on standing, members of FOB submitted affidavits to the district court asserting cognizable injury if the project went forward. Specifically, Barbara Quaney, FOB's president, claimed the new parking lot would damage her personal and economic interests because she lives in historically designated property within 500 feet of Bethany Place and further claimed the project would directly result in economic loss or diminution of her home's property value. She also alleged the project would have a negative economic impact on three other residences she owns in the vicinity. And Quaney's husband Douglas Jones, who is another FOB member, asserted the same interests. We note this court considers "well settled" that a landowner is a competent witness to testify as to the value of that landowner's property. *City of Wichita v. Chapman*, 214 Kan. 575, 580, 521 P.2d 589 (1974); see *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, Syl. ¶ 6, 274 P.3d 609 (2012). And the only time the district court addressed standing was when it denied the City's motion to dismiss.

As correctly determined by the Court of Appeals, Quaney and Jones alleged individualized interests that are particular to them and not shared generally by all other Topeka citizens. *Friends of Bethany Place*, 43 Kan. App. 2d at 200. Several other FOB members who live in the neighborhood also filed affidavits alleging the project, if built, would impair the quality of their lives and interfere with their aesthetic appreciation of their neighborhood, which interests are compatible with the legislature's stated purpose for the Act. See K.S.A. 2012 Supp. 75-2715.

Returning to the question whether such individuals would satisfy the "person aggrieved" requirement in K.S.A. 2012 Supp. 75-2724(b) and, therefore, be empowered to seek review of the Council's decision to proceed with the building permit, we hold that these circumstances are sufficient. After all, the legislature has recognized there should be a 500-foot zone within which special conditions apply by requiring notice to landowners when a historic site is established or modifications to the property are proposed; some

FOB members own property within that statutorily set area; affidavits of those property owners provide evidence that property values will be adversely impacted by the project; and because of the alleged decrease in those property values, those property owners argue they are adversely affected and, therefore, aggrieved under the statute. Our reading of the statute in this fashion to hold that standing exists for these individuals follows the statutory language, is consistent with our caselaw, and promotes the Act's stated purposes. As the district court observed, historic preservationists generally might be the only public oversight to the governmental process authorizing construction at historic locations. The legislature has recognized this possibility by conferring the right to seek judicial review on any "person aggrieved." K.S.A. 2012 Supp. 75-2724(b).

We must determine next whether FOB, as the organization prosecuting the claims, meets the traditional test for associational standing.

*Traditional Standing*

An association has standing to sue on behalf of its members if: (1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Bremby*, 286 Kan. 745, Syl. ¶ 7. The parties dispute whether the first two elements are met.

To address the first, we must decide whether FOB members have standing to sue individually. To establish this, an individual must demonstrate he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 (2011); *Bremby*, 286 Kan. at 761. This court has also interpreted standing generally to require a plaintiff to have a personal interest in a court's decision and to have personally suffered some actual or threatened injury as a result of the defendant's conduct. *Lower v.*

*Board of Dir. of Haskell County Cemetery Dist.*, 274 Kan. 735, 747, 56 P.3d 235 (2002).

Those requirements are met in this case. As discussed previously, FOB's president Quaney and her husband claim the parking lot addition will damage their personal and economic interests as landowners living within 500 feet of Bethany Place. They also allege the construction would adversely impact three residences they own in the vicinity. And other FOB members submitted affidavits that are in the record alleging the project would hurt the quality of their lives and interfere with their appreciation of the neighborhood.

We reject the Church's argument that these claimed injuries are insufficient to sustain a legal right or pecuniary interest based on *Linsea*. In that case, Linsea argued the decision at issue adversely affected his interests as a taxpayer and his aesthetic appreciation of the courthouse. The Court of Appeals addressed only the taxpayer-based argument and held Linsea lacked standing on that basis because he did not allege a special injury not suffered by other citizens and taxpayers. 12 Kan. App. 2d at 661.

In contrast, no FOB member claims taxpayer standing. Instead, at least some of its membership asserts a special injury not suffered by other citizens in the form of the diminution of property values in their neighborhood and the adverse impact on their use or enjoyment of their property on a frequent basis as a direct result of the proposed modifications to Bethany Place. On this basis, *Linsea* is easily distinguished.

We find *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175-78 (3d Cir. 2000), more analogous. In that case, the Third Circuit Court of Appeals held that neighborhood residents had standing to contest a local government's decision to permit the building of a hotel and parking garage adjacent to their neighborhood. The residents claimed a legal interest because they lived in the area and enjoyed on a frequent basis the amenities of the historic district at issue. They also claimed the project would increase traffic, pollution, and noise, with an attendant detrimental impact on their historic neighborhood's ambiance and property values. The *Society Hill* court held these residents had a legally protectable

interest in guarding their neighborhood's historic and environmental quality. The court noted further that holding otherwise would render it difficult for any person to have standing to appeal this type of governmental action. 210 F.3d at 176.

The same analysis applies to the Council's action to approve the building permit for Bethany Place. At least some FOB members allege the project will detrimentally impact their neighborhood, quality of life, and their property values. As individuals, these FOB members have standing to sue.

As to the second element needed to establish associational standing—that the interests the association seeks to protect are germane to the organization's purpose—the Court of Appeals held that the individual members' economic interests were tied to maintaining Bethany Place in its current form. *Friends of Bethany Place*, 43 Kan. App. 2d at 201. We agree. And it is clear FOB was organized to stop the parking lot project because its individual members have economic and aesthetic interests in preserving Bethany Place's historical integrity as it is and have joined together to advance that cause. As to the third element, the panel correctly determined that FOB asserts its members' adverse impact not as a claim for damages, but as a basis for standing. 43 Kan. App. 2d at 200-01. FOB argues only that granting the permit violates the Act. Therefore, individual member participation in this action is not necessary.

We hold that standing is established and move next to the merits of the Council's decision.

## THE COUNCIL'S DECISION-MAKING DOES NOT WITHSTAND SCRUTINY

### Scope of Review

To resolve the parties' dispute on the merits, we must first revisit the authority for and substance of their appeal. As stated above, K.S.A. 2012 Supp. 75-2724(b), which is part of the Historic Preservation Act, controls FOB's appeal. It specifies that judicial review of determinations made under the Act must be in accordance with K.S.A. 60-2101. Subsection (d) of that statute provides:

"A judgment rendered or final order made by a political or taxing subdivision, or any agency thereof, exercising judicial or quasi-judicial functions may be re-

versed, vacated or modified by the district court on appeal. If no other means for perfecting such appeal is provided by law, it shall be sufficient for an aggrieved party to file a notice that such party is appealing from such judgment or order with such subdivision or agency within 30 days of its entry . . . . The clerk shall thereupon docket the same as an action in the district court, which court shall then proceed to review the same, either with or without additional pleadings and evidence, and enter such order or judgment as justice shall require."

This court's caselaw interpreting K.S.A. 60-2101(d) has long held that a district court reviewing a political subdivision's quasi-judicial decision, such as this one, is limited to determining: (1) if the political subdivision's decision fell within the scope of its authority; (2) was supported by substantial competent evidence; or (3) was fraudulent, arbitrary, or capricious. *143rd Street Investors v. Board of Johnson County Comm'rs*, 292 Kan. 690, 709, 259 P.3d 644 (2011). Notably, FOB does not dispute whether the Council acted without authority. Instead, FOB challenges whether the Council's determination was supported by the evidence and whether the Council's action was fraudulent, arbitrary, or capricious. And that is the basis upon which we review the Council's action.

In *Reiter v. City of Beloit*, 263 Kan. 74, 93-94, 947 P.2d 425 (1997), this court held that the ultimate inquiry under K.S.A. 75-2724 is whether the governing body took a "hard look" at all relevant factors. There, the owner of a nationally registered historic property appealed from the City of Beloit's decision to rezone land within the environs of historic property to allow a commercial construction project. The historic property's owner argued the City erred in finding there were no feasible and prudent alternatives to locating the project within the environs of her historic property because the City did not find as a matter of sound engineering that it could not be built somewhere else. The owner claimed the City needed to show that the disadvantages to building elsewhere were unique, truly unusual, or reached extraordinary magnitudes. She based that argument on a standard articulated in a federal case, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411-13, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971).

The *Reiter* court distinguished the *Overton Park* Court's definition of "feasible and prudent alternatives" because the federal

statute at issue in that case involved the actual taking of public lands or historic sites and, therefore, required closer scrutiny. 263 Kan. at 93. Instead, the *Reiter* court held that the phrase "feasible and prudent alternative" in K.S.A. 75-2724 should be given its natural and ordinary meaning:

"In reviewing a determination of a governing body under K.S.A. 75-2724 that there is no feasible and prudent alternative to the proposal and that the program includes all possible planning to minimize harm to such historic property, *the ultimate question for appellate review is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence.*" (Emphasis added.) 263 Kan. at 93-94.

But despite the language in *Reiter* holding that appellate courts are to review whether the governing body took a hard look at all relevant factors when acting under what is now K.S.A. 2012 Supp. 75-2724, the Church argues the hard look test does not apply. It claims the *Reiter* court employed a lower standard because the project would not destroy any historic property. But this position represents a departure from the Church's argument to the Court of Appeals, where both the Church and City recited and applied *Reiter's* hard look test in their briefs. It is difficult to reconcile the apparently contradictory positions taken before our two courts.

The panel majority omitted any reference to the hard look test in its analysis, even though in his dissent Judge Greene argued it applied and that the Council's determination could not be upheld under its standards. *Friends of Bethany Place*, 43 Kan. App. 2d at 220-22. The panel majority's failure without explanation to apply the hard look test is puzzling. See *State v. Shaw*, 47 Kan. App. 2d 994, 1006, 281 P.3d 576 (2012) ("The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position."), *rev. denied* 297 Kan. 1 (2013); *In re Care & Treatment of Girard*, 45 Kan. App. 2d 1109, 1111, 257 P.3d 1256 (2011) (same), *rev. granted on other grounds* March 9, 2012; *Tyler v. Goodyear Tire & Rubber Co.*, 43 Kan. App. 2d 386, 391, 224 P.3d 1197 (2010) (same); *Buchanan v. Overley*, 39 Kan. App. 2d 171, 175-76, 178 P.3d 53 (same), *rev. denied* 286 Kan. 1176 (2008).

*Reiter*, 263 Kan. at 93-94, clearly adopts the hard look test in all cases involving a governing body's determination under K.S.A. 75-2724, citing *Hickory Neighborhood Defense League v. Burnley*, 703 F. Supp. 1208, 1219 (W.D.N.C. 1988), *modified on other grounds* 893 F.2d 58 (4th Cir. 1990). The *Burnley* court, relying on *Overton Park*, held the scope of authority to approve a project situated on historic land was narrow under the federal law. 703 F. Supp. at 1214. It then held:

> "The ultimate question for the Court is whether the agency took a hard look at all relevant factors, and used plain common sense in its determination as to whether the facts before the Secretary [of Transportation] support his decision that there is no prudent and feasible alternative . . . for the project[.]
>
> " '[T]he court is "not [to] make the ultimate decision" but only to see "that the official or agency take a 'hard look' at all relevant factors." This is so because the power of judicial review in this area, is a narrow one to be applied within reason, and in essence is confined to a determination of whether the administrative decision "represented a clear error of judgment." In making such determination, the court is not to be led into construing the mandating statutes as a device to be used as "a crutch for chronic faultfinding" and, it is not to fault an agency for failure to consider "an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." Nor is the agency obligated "to consider in detail each and every conceivable variation of the alternatives stated;" it ' "need only set forth those alternatives 'sufficient[ly]' to permit a reasonable choice.'" In sum, so long as the court, in its review, observes the rule of reason and practicality and takes a "hard look" at the relevant factors, it performs its obligation under the statutes.' " 703 F. Supp. at 1219 (quoting *Coalition for Responsible Reg. Dev. v. Coleman*, 555 F.2d 398, 400 [4th Cir. 1977]).

As we noted in *Reiter*, this standard continues to reflect both the deference owed to the governing body's decision and the requirement that the governing body set forth sufficient alternatives and use common sense when deciding whether to approve a proposed project. And it must be kept in mind this case concerns review of a quasi-judicial determination made by the Council. This court has stated: "The term 'quasi-judicial' is applied to administrative boards or officers *empowered to investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of a judicial nature.*" (Emphasis added.) *Thompson v. Amis*, 208 Kan. 658, Syl. ¶ 6, 493 P.2d 1259, *cert. denied* 409 U.S. 847 (1972). While it is true that a city council may perform

executive, legislative, or judicial functions depending on the context, in this determination the Council is acting in a quasi-judicial role with statutory obligations regarding the investigation of facts and the evaluation of those facts. See K.S.A. 2012 Supp. 75-2724(a).

The hard look test is a natural articulation for how a court should determine whether a governing body's investigations and decision-making under the Act are supported by the evidence or are arbitrary or capricious when reviewed under K.S.A. 60-2101(d). And this view is consistent with how federal courts have conducted their review under similar statutory provisions. See *Mount St. Scholastica, Inc. v. City of Atchison*, 482 F. Supp. 2d 1281, 1290 (D. Kan. 2007); *Lawrence Preservation Alliance, Inc. v. Allen Realty, Inc.*, 16 Kan. App. 2d 93, 100-01, 819 P.2d 138 (1991); see also *Reiter*, 263 Kan. at 93 (cases interpreting federal statute helpful in interpreting K.S.A. 75-2724). Thus, we decline the Church's and the dissent's invitation to overturn *Reiter*. See *Miller v. Johnson*, 295 Kan. 636, 653-54, 289 P.3d 1098 (2012) (setting out rationale for the doctrine of stare decisis). We hold that the hard look test is applicable under the circumstances of this case. We address next whether the Council's hearing demonstrated that the Council took the required hard look at all relevant factors.

The Act places certain obligations on the governing body, which in this case is the Council, when the SHPO determines a project will encroach upon, damage, or destroy any historic property. And if there is an objection from the SPHO, K.S.A. 2012 Supp. 75-2724(a)(1) states the project shall not proceed until

"the governing body of the political subdivision . . . has made a determination, based on a consideration of all relevant factors, that there is no feasible and prudent alternative to the proposal and that the program includes all possible planning to minimize harm to such historic property resulting from such use." (Emphasis added.)

Under the statute's plain language, the Council was required to determine: (1) There were no feasible and prudent alternatives to the proposed parking lot project; and (2) the program included all possible planning to minimize harm from the proposed project. And as to what these determinations actually entail, guidance is

provided in the applicable administrative regulations. The phrase "feasible and prudent alternative" is defined as "an alternative solution that can be reasonably accomplished and that is sensible and realistic." K.A.R. 118-3-1(e). When determining whether a feasible and prudent alternative exists requires consideration that includes: (1) technical issues; (2) design issues; (3) the project's relationship to a community-wide plan, if any; and (4) economic issues. K.A.R. 118-3-1(e).

K.A.R. 118-3-1(i) defines the phrase "program includes all possible planning" in the statute to mean that

"the written evidence and materials submitted by a governmental entity to the state historic preservation officer clearly identify all alternative solutions that have been investigated, compare the differences among the alternative solutions and their effects, and describe mitigation measures proposed by the project proponent that address an adverse effect determination of the state historic preservation officer."

And K.A.R. 118-3-1(j) defines the term "relevant factors" to mean "pertinent information submitted by project proponents or project opponents in written form, including evidence supporting their positions."

It is not immediately clear from K.S.A. 2012 Supp. 75-2724(a) who is responsible for presenting the governing body with the information needed to determine whether there are feasible and prudent alternatives to the proposed project. The Court of Appeals first addressed that issue in *Allen Realty, Inc. v. City of Lawrence*, 14 Kan. App. 2d 361, 790 P.2d 948 (1990).

In *Allen Realty*, the Lawrence City Council denied Allen Realty's application to demolish a church it owned after the SHPO held that the project would damage or destroy the environs of the Douglas County Courthouse—a registered state historic property. After the City denied the permit request, Allen Realty appealed to the district court arguing the City erred by placing the burden on it, the project's proponent, to prove that no feasible and prudent alternatives to demolition existed. The district court adopted a burden-shifting framework, placing the initial burden on the project's proponents to show that no viable alternatives existed. If satisfied, that burden then shifted to project opponents to suggest possible

reasonable alternatives, and then back to the project's proponent to dispel them as imprudent or infeasible.

On appeal, the *Allen Realty* court rejected the district court's burden-shifting framework as inappropriate. 14 Kan. App. 2d at 373. Instead, it held the burden of proof rested at all times with the project's proponent because it was the party who would benefit by the finding that no feasible and prudent alternatives exist. 14 Kan. App. 2d at 371. The court described that burden by adding to the definition of "relevant factors" in K.S.A. 75-2724 a requirement that they be "something more than mere suggestions to possible alternatives." 14 Kan. App. 2d at 373. The *Allen Realty* court held that a proposed alternative is not a relevant factor requiring consideration unless a proposal includes sufficient factual information to support a conclusion that the alternative was feasible and prudent. 14 Kan. App. 2d at 373.

Despite expressly overruling a burden-shifting framework, we note that as a practical matter *Allen Realty* creates a different burden-shifting framework, placing the initial burden on project opponents. And the Court of Appeals majority followed in the *Allen Realty* court's footsteps and held that the Church, as the project's proponent, "had to demonstrate that (1) there are no feasible and prudent alternatives, and (2) all possible planning has been undertaken to minimize harm to the historic property." *Friends of Bethany Place*, 43 Kan. App. 2d at 205.

But the panel majority also limited that burden by holding that the Church was not obligated to refute every potential alternative unless that alternative was " 'something more than a mere suggestion as to possible alternatives.' " 43 Kan. App. 2d at 205. In other words, the panel majority imposed a threshold requirement that information regarding a possible alternative carry with it some undefined level of gravitas that would take that alternative beyond the category of a "mere suggestion," whatever that may mean.

In examining the record before it, the panel majority held that no proposed alternative made by project opponents or the City's own departments warranted further consideration, stating: "None of these suggestions includes sufficient factual information to support a conclusion that it constitutes a feasible and prudent alter-

native to the Church's proposal. 43 Kan. App. 2d at 207. The panel majority further held that both the SHPO and the City's professional staff failed to provide "any analysis whatsoever" in support of their suggestion of angled on-street parking. 43 Kan. App. 2d at 208. And in light of those holdings, the panel majority concluded that "none of the suggested alternatives constitutes a relevant factor which the Council was required to consider in acting on the Church's application." 43 Kan. App. 2d at 209.

We agree there was an absence of technical, design, and economic considerations submitted to the Council regarding potential alternatives. See K.A.R. 118-3-1(e). Several alternatives were suggested either by written submissions before the meeting or by project opponents at the meeting. They can be summarized as: (1) create cut-back street parking in front of the Church along 8th Street; (2) create cut-back street parking beside the Church along Polk Street; (3) convert two Church-owned vacant lots on 8th Street into parking lots; (4) restrip the current surface lot to the west of the Church to create additional handicap accessible spaces; (5) turn the Church's current surface parking lot into a parking garage; and (6) convert the circle drive east of the Church into a parking lot. The SHPO recommended the first and second options of using the City's right-of-way to design parking stalls along Polk and 8th Streets as needed. Likewise, the City's Traffic Engineering Division recommended the second option—angled cut-back parking along southwest Polk Street.

But we disagree with the panel majority's conclusion that a project's proponent is only obligated to refute those alternatives advanced by project opponents that are presented in sufficient detail to satisfy the *Allen Realty* court's test of "something more than a mere suggestion as to possible alternatives." Such an analysis is flawed because the project opponents do not have a burden to present sufficient detail of any alternatives. And the project proponents do not have the burden to refute any alternatives.

We also disagree with the panel majority's conclusion that the Council may ignore whether any possible alternatives exist and approve a project *unless* the project's proponents and opponents present it with sufficient evidence to determine whether the pro-

ject can be approved under K.S.A. 2012 Supp. 75-2724(a). Such an approach ignores that the statute places on the governing body alone the responsibility to determine (1) whether any alternatives are feasible and prudent and (2) whether all possible planning has been done to minimize harm from the proposed project. And the statute provides that a project "shall not proceed" until that determination is made. In this context, the performance of the Council's quasi-judicial function includes its authority to investigate facts when necessary to perform that function. See *Thompson*, 208 Kan. 658, Syl. ¶ 6.

The duty of establishing whether alternatives exist and whether those alternatives are feasible and prudent rests at all times with the governing body under K.S.A. 2012 Supp. 75-2724(a). To properly discharge that duty, a governing body cannot sit back and passively wait for members of the public to present it with evidence regarding potential alternatives and the feasibility of those alternatives. Nor can the governing body approve a project without making its own inquiries—if members of the public have not fully presented it with the information needed to make the decision.

Certainly, the project's proponents, opponents, or even unaligned members of the public at large may present factors relevant to this determination. And the Church and FOB undertook almost herculean efforts, using their own resources, to aid the Council in making its determination. But the efforts of interested parties in submitting information for the Council's determination may not paint the whole picture. And as the panel majority noted, the City's own staff failed to produce substantive information regarding even its own proposed alternatives. See *Friends of Bethany Place*, 43 Kan. App. 2d at 207-08.

In this case, the City was in the best position to furnish its Council with the information needed. The City had a traffic engineering division and planning department at its disposal. And City Ordinance 2.60.010 created the Topeka Landmarks Commission, which had a duty to advise the Council on historic assets. Moreover, these entities reviewed the project as part of the City's decision-making process and indicated, at the very least, the prospect of alternatives to the project as proposed.

The sole letter from the planning department contained one meager sentence, indicating: "The City of Topeka Traffic Engineering Division has determined that angled 'cut-back' parking along SW Polk Street, adjacent to the Bethany Place property[,] would be a feasible alternative." And no information was provided regarding how many parking spaces this alternative would yield, whether it could yield more handicap accessible parking, the costs, who would be responsible for those costs, or the options available to the Church to reserve the parking when needed. Likewise, the Landmarks Commission's action form simply indicates the commission

"re-affirmed the SHPO's finding and have also recommended DENIAL of the parking lot permit. Both parties support the pursuit of alternatives that would provide patrons of Grace Cathedral with parking within the immediate vicinity of the church, while protecting the grounds of Bethany Place."

There is no deeper discussion as to what "alternatives" the Landmarks Commission recommended, much less information allowing the Council to determine whether they were feasible and prudent.

This lack of detail did not relieve the Council of its statutory obligations. The Council was required under K.S.A. 2012 Supp. 75-2724(a) to determine whether the project included all possible planning to minimize harm to the historic property. Notably, the process outlined in K.A.R. 118-3-1(i) required submitting to the SHPO all alternative solutions investigated, comparing those alternatives and their effects, and describing proposed mitigation measures. If done properly, fulfilling the requirements in K.A.R. 118-3-1(i) would have provided information that the Council had to consider in discharging its duties. But City personnel did not comply with those requirements when forwarding information to the SPHO.

In conclusion, we hold that the governing body is required under K.S.A. 2012 Supp. 75-2724(a) to establish that no feasible and prudent alternatives exist and that all possible planning has been done to minimize harm to the historic property, because it is the governing body that is charged with making those determinations. The record before us demonstrates the Council's determination fell far

short of the requirement that it take a hard look at all the relevant factors in regard to possible alternatives. As such, the Council's failure to adequately perform its investigatory role to identify what feasible and prudent alternatives exist and what planning was or could be done to minimize harm to Bethany Place makes the Council's determination arbitrary and capricious. It .did not take into account the applicable law and the principles underlying that law. See *Reiter*, 263 Kan. at 93-94 ("[T]he ultimate question for appellate review [under K.S.A. 75-2724] is whether the governing body took a hard look at all relevant factors and, using plain common sense, based its determination upon the evidence.").

We reverse and remand to the district court with instructions to remand to the Council for another hearing after the necessary information is submitted to the Council. See *Davenport Pasture, LP v. Board of Morris County Comm'rs*, 31 Kan. App. 2d 217, 225, 62 P.3d 699, *rev. denied* 276 Kan. 967 (2003). On remand, the parties may dispute whether the recent changes to the law impact the analysis. See L. 2013, ch. 129, sec. 4. At first blush, the amendment appears to limit the circumstances under which the SHPO must be notified of a proposed project to those in which the proposal "directly involves a historic property." But that amendment may not affect the issues here because the Church proposes to situate the parking lot directly on a site designated on the Register of Historic Kansas Places.

Our holding renders the parties' remaining arguments moot.

Judgment of the Court of Appeals reversing and remanding to the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court with instructions.

NUSS, C.J., not participating.

TIMOTHY G. LAHEY, District Judge, assigned.

* * *

LAHEY, J., dissenting: Nearly 7 years have passed since Grace Cathedral and The Episcopal Diocese of Kansas, Inc. (the Church) put forth a proposal to construct a parking lot on its property. The parking lot would address the Church's undisputed parking shortage and permit the elderly and handicapped to enjoy the property. This project is consistent with the underlying purpose of the Historic Preservation Act, which is "to foster and promote the conservation *and use* of historic property for the education, inspiration, pleasure and enrichment of the citizens of Kansas." (Emphasis added.) K.S.A. 2012 Supp. 75-2715. At the hearing before the Topeka City Council, the Church came forward with substantial evidence to show why the alternatives suggested by the State Historical Preservation Officer (SHPO) and Friends of Bethany Place, Inc. (FOB) were not reasonable and prudent, and it presented a plan to minimize harm to the historic property. When the City Council unanimously approved the proposed parking lot, the SHPO did not seek review of that determination. But based on an appeal by FOB, the court now decides the matter must begin anew and that the City Council, as part of its adjudicative responsibility under K.S.A. 2012 Supp. 75-2724, must undertake its own investigation of each alternative suggested at the City Council meeting.

I disagree with the majority in three respects: (1) I would find FOB lacks standing to bring this appeal; (2) I oppose the majority's application of a federal environmental law standard of review rather than Kansas law; and (3) the majority's substantive analysis is contrary to the plain language of the Historic Preservation Act and the applicable regulations.

*Statutory Standing*

Notwithstanding their commitment to historic preservation and their ownership of property in the same neighborhood as Bethany Place, the members of FOB have no legal or economic interest sufficient to confer standing to bring this appeal. To have standing, FOB must be aggrieved.

Although the term "aggrieved" is not defined by the Historic Preservation Act, the requirement that a person be aggrieved for

appeal purposes is present in dozens of Kansas statutes. See, *e.g.*, K.S.A. 2-2478(c); K.S.A. 2-2511(e); K.S.A. 2-3317(d); K.S.A. 3-709(1); K.S.A. 8-2410(e); K.S.A. 2012 Supp. 8-2605(d); K.S.A. 9-1111(c)(8); K.S.A. 2012 Supp. 9-1804(e); K.S.A. 12-520c(c); K.S.A. 2012 Supp. 12-521(f); K.S.A. 12-532(f); K.S.A. 12-760(a); K.S.A. 15-126(a); K.S.A. 16a-6-108(4); K.S.A. 2012 Supp. 17-2221a(b)(3); K.S.A. 19-223; K.S.A. 19-270(b); K.S.A. 25-4185; K.S.A. 25-4331; K.S.A. 31-159(c); K.S.A. 2012 Supp. 32-1114(f); K.S.A. 36-515b(c); K.S.A. 39-7,139(c); K.S.A. 39-7,150(k); K.S.A. 40-205d; K.S.A. 44-1021(a); K.S.A. 46-292; K.S.A. 47-624(d); K.S.A. 2012 Supp. 47-1809(j); K.S.A. 55-443(f); K.S.A. 55-606(b); K.S.A. 58-3058; K.S.A. 58-4211(f); K.S.A. 65-6a56(d); K.S.A. 65-4211; K.S.A. 74-2438; K.S.A. 74-7028; K.S.A. 77-631(a); K.S.A. 2012 Supp. 82a-302(a); K.S.A. 2012 Supp. 82a-737(f); K.S.A. 82a-1216(d); K.S.A. 83-502(e).

There is no indication the legislature intended "aggrieved" to have a special meaning in the Act different from these other areas of law. Whether a person is aggrieved has been defined by this court:

" ' "A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected. [Citations omitted.]" ' " *Finstad v. Washburn University of Topeka*, 252 Kan. 465, 472, 845 P.2d 685 (1993) (quoting *Fairfax Drainage District v. City of Kansas City*, 190 Kan. 308, 314-15, 374 P.2d 35 [1962]).

The majority finds FOB is a statutory "aggrieved party" because two individual FOB members live within 500 feet of Bethany Place and "the Act contains two provisions placing particular emphasis on landowners within 500 feet of a historic property." 297 Kan. at 1124. Neither provision cited by the majority supports the conclusion that the legislature intended to confer standing upon landowners merely because they own property located within 500 feet of a historic property. The first provision, K.S.A. 2012 Supp. 75-2720(b), requires notice to owners of property within 500 feet only

at the time a property is proposed for placement on the historic register. This provision has no application to the present case. Bethany Place was put on the Register of Historic Kansas Places in 1978.

The second provision, K.S.A. 2012 Supp. 75-2724(a), does apply here, but it only requires that notice of a proposed project be given to the SHPO. Significantly, it does not require notice to surrounding property owners. In analyzing statutory standing, the majority observes: "[T]he legislature has recognized there should be a 500-foot zone within which special conditions apply *by requiring notice to landowners when a historic site is established or modifications to the property are proposed.*" (Emphasis added.) 297 Kan. at 1125. This statement is simply wrong. There is no statutory language which requires notice to landowners when modifications to a historic property are proposed.

The notice provisions cited by the majority actually support a contrary conclusion—that the legislature did not intend to confer aggrieved status to surrounding owners under the factual circumstances of the present case.

When the Church applied for the parking lot permit in 2007, K.S.A. 75-2724 (a) and (c) required notice only to the SHPO, who was tasked with initiating "an investigation of any proposed project within 30 days." Had the legislature intended "to confer special consideration" to property owners located within 500 feet of a project, it would have provided for notice to them just as it did when a property is originally considered for historic designation. Given the statute does not require notice to surrounding owners, the logical conclusion is that the legislature did not intend to grant any particular status to those owners. It makes no sense to conclude that the legislature intended to grant a right to appeal to surrounding owners but only in the fortuitous circumstance that they happen to find out about a proposed project.

The majority expresses concern that in the absence of standing for FOB, there will be no public oversight to the governmental process authorizing construction at historic locations. The intent of the legislature in this regard is apparent in the Act itself. Enforcement of the public policy favoring historic preservation is specifi-

cally vested in the attorney general, the State of Kansas, any political subdivision, and certain city or county historical societies. See K.S.A. 75-2725. The legislature could but did not grant owners of property located within 500 feet of historic property special statutory authorization to enforce the Act. The law does not grant surrounding owners any legal or equitable interest in the neighboring historic property.

Reading the Act as a whole, the appropriate conclusion is that the legislature did not intend for surrounding owners to have any particular status that would make them "aggrieved" for appeal purposes. I would find FOB lacks statutory standing.

*Traditional Standing*

In what amount to wholly conclusory affidavits, FOB members Barbara Quaney and her husband Douglas Jones claim that "[t]he building of a parking lot on Bethany Place grounds would impair my quality of life and interfere with my aesthetic appreciation of the nature and character of my neighborhood. It could also result in economic loss or the diminution of property value of 821 SW Western." Although the diminution of value may be a cognizable injury, there is simply no factual basis in the record to show that placement of a parking lot, more than a football field away from the Quaney and Jones property, would cause a loss in value. As noted in *Finstad,* to be aggrieved a person must suffer some substantial grievance. Substantial means something that is real, not imagined, something with substance and not ephemeral. *State v. Eisele,* 262 Kan. 80, Syl. ¶ 2, 936 P.2d 742 (1997). It is synonymous with material, tangible, consequential, significant. See Websters Collegiate Thesaurus, p. 796 (1976).

Kansas cases in which adjacent property owners have been found to have standing all contain evidence of some tangible harm to the adjacent property. For example, in *Board of Sumner County Comm'rs v. Bremby,* 286 Kan. 745, 189 P.3d 494 (2008), the tangible harm included contamination of soil, groundwater, and surface water from a landfill; in *Families Against Corporate Takeover v. Mitchell,* 268 Kan. 803, 1 P.3d 884 (2000), it was the introduction of odor, flies, vermin, and pestilence from a hog farm; and in *Coch-*

*ran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 249 P.3d 434 (2011), it was the loss of water rights. Here, the claim of injury is purely ethereal, and there is no evidence of any tangible intrusion on the Quaney and Jones property.

The only physical change to Bethany Place from the construction of the parking lot will be the removal of trees and shrubs that were not even on the property at the time the historic buildings were placed there. The Church's plan to minimize harm to the property included the planting of more trees and shrubs than would be removed to accommodate the parking lot. The parking lot will not intrude upon or physically alter any property belonging to FOB members. Indeed, no FOB member even shares a property boundary with Bethany Place. The Quaney and Jones residence is separated from Bethany Place by Topeka High School, and their other properties are located on an adjacent block. The proposed parking lot will not affect the ground, air, or water quality of any surrounding property. There is no claim that anyone will be burdened by increased pollution, noise, or traffic. The historic buildings on Bethany Place will not be altered or modified in any way. The parking lot will occupy less than 4.5 percent of the Bethany Place grounds, and it will reduce green space on the property from 187,800 to 175,800 square feet. This minor alteration to the Church's privately owned property is insufficient to constitute a substantial grievance and confer standing upon FOB.

The majority finds that FOB has a legally protectable interest based on aesthetics, *i.e.*, FOB's view that the parking lot would detrimentally impact the quality of life in the neighborhood and possibly reduce surrounding property values. It cites *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175-78 (3d Cir. 2000), for the proposition that residents have a legally protectable interest in guarding their neighborhood's historic quality.

*Society Hill* does not support the proposition that aesthetics alone provide a sufficient basis to confer standing. While it is correct that the commercial development at issue in *Society Hill*—a 350-room hotel with a 500-car parking garage—was objected to on the basis of its aesthetic impact on a historic neighborhood, there was also evidence of tangible problems including increased noise,

traffic, and pollution. No similar evidence of harm is present here. Additionally, the introduction of a massive hotel and parking complex in a neighborhood is in no way comparable to the minor reduction in green space required for a church parking lot that will be shielded from view by trees and shrubs.

I would find that no individual member has established a cognizable injury or a causal connection between any claimed injury and the presence of a parking lot on Bethany Place. Further, there is no evidence that the parking lot will cause a substantial grievance, result in a denial of any personal or property right, or impose any burden or obligation sufficient to confer standing. Consequently, I believe the case should be dismissed for lack of jurisdiction.

*Scope of Review/Standard of Review*

At the same time the legislature declared historic preservation to be among the highest priorities of the State, it also specifically provided that appellate review of historic preservation cases would be in accordance with K.S.A. 60-2101. See K.S.A. 2012 Supp. 75-2724(b). For appeals under K.S.A. 60-2101, both the scope and standard of review are well established. In the Court of Appeals majority opinion in this case, Judge McAnany accurately summarized the review process as follows:

"The parties agree that the task of the district court was to review the Council's action to determine 'whether, as a matter of law, (1) the tribunal acted fraudulently, arbitrarily, or capriciously, (2) the administrative order is substantially supported by the evidence, and (3) the tribunal's action was within the scope of its authority.' [Citation omitted.] In doing so, the district court was not permitted to substitute its judgment for that of the Council.

"On appeal, we apply the same standards of judicial review applicable to the district court. [Citation omitted.]

. . . .

". . . [T]he central issue is whether substantial evidence supports the Council's decision. In resolving this issue, we apply the traditional rule that when examining the record for substantial evidence, we view the evidence and the reasonable inferences that can be drawn from the evidence in the light more favoring the prevailing party, here the Church. [Citations omitted.] In doing so we do not substitute our own view on the merits of the Church's proposal. [Citation omitted.] That was a matter for the duly elected officials of the City's governing body to determine. If substantial evidence supports the Council's decision, the decision

must be upheld even if we would have decided the matter differently. [Citation omitted.] Because there is a presumption that the governing body acted reasonably, the burden is upon FOB to prove otherwise. [Citations omitted.] Finally, a reviewing court must accept as true the evidence and inferences supporting the Council's findings and disregard conflicting evidence and inferences. [Citation omitted.]" *Friends of Bethany Place v. City of Topeka*, 43 Kan. App. 2d 182, 201-02, 222 P.3d 535 (2010).

Since the legislature is presumed to act with knowledge of relevant judicial decisions, *State v. Trudell*, 243 Kan. 29, 34, 755 P.2d 511 (1988), it is fair to conclude the legislature intended that appellate review be limited and in accord with the foregoing standards. Nothing in the Historic Preservation Act indicates that the legislature intended the scope or standard of review for historic preservation appeals be different than other appeals pursuant to K.S.A. 60-2101. If the legislature intended a special type of review for historic preservation cases, it would have provided for it in the statute. In other words, notwithstanding the importance of historic preservation as a public policy, the legislature directed that historic preservation appeals be handled in the same manner as other quasi-judicial decisions by political subdivisions.

The court in *Reiter v. City of Beloit*, 263 Kan. 74, 947 P.2d 425 (1997), and again today changes the standard of review by adopting the "hard look" standard from federal environmental law. The hard look standard applies in cases brought under the National Environmental Policy Act (NEPA) and is part of the federal test for whether factual determinations made by an agency are arbitrary and capricious. See *Citizens' Commission to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176-79 (10th Cir. 2008). For purposes of all other types of appeals under K.S.A. 60-2101, arbitrary "means without adequate determining principles, not done or acting according to reason or judgment, and capricious means changing, apparently without regard to any laws." *Robinson v. City of Wichita Retirement Bd. of Trustees*, 291 Kan. 266, Syl. ¶ 2, 241 P.3d 15 (2010). There is no general "hard look" analysis in appellate review under K.S.A. 60-2101. Rather, the majority adopts it as a special standard which applies only in historic preservation cases.

In review of the Court of Appeals opinion, the majority observes: "The panel majority omitted any reference to the hard look test in

its analysis, even though in his dissent Judge Greene argued it applied and that the Council's determination could not be upheld under its standards. See *Friends of Bethany Place*, 43 Kan. App. 2d at 220-21." 297 Kan. at 1130. Judge Greene viewed the Court of Appeals majority analysis as "simplistic" and he advocated subjecting "the action of the governing body to a higher degree of scrutiny." 43 Kan. App. 2d at 220, 224. The higher level of scrutiny is the hard look test. It alters the level of deference given to the governing body. Rather than beginning with a presumption that the City Council acted reasonably, with the burden on FOB to establish otherwise, the majority finds in the hard look test a requirement that the governing body investigate and analyze sufficient alternatives to affirmatively demonstrate it made a reasonable decision.

The NEPA statutory scheme requires preparation of a detailed statement of the various relevant factors, including alternatives to a proposed action. See 42 U.S.C. § 4332(2)(C)(iii) (2006). Unlike Kansas law, under federal environmental law an agency is required to do more than determine among opposing alternatives; it is statutorily obligated to investigate and prepare an environmental assessment or environmental impact study to thoroughly explain its decision. See 40 C.F.R. § 1505.2(b) (2012).

This required, detailed written statement in NEPA cases allows a court to examine how the agency evaluated the relevant information, and it plainly lends itself to a "hard look" analysis. Because we do not require formal findings and conclusions by political subdivisions, see *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 678, 952 P.2d 1302 (1998), we do not have the benefit of a detailed, written analysis to enable us to evaluate the extent of the City Council's consideration of each relevant factor. Unlike NEPA, nothing in the Historic Preservation Act requires the City Council to investigate and then prepare a report containing a summary of alternatives or discussion of factors. For purposes of appeal, all that is required is that the City Council provide a sufficient record of the evidence presented so that the court can determine if the decision of the City Council was supported by that evidence or was arbitrary or capricious, as defined in Kansas law.

The thorough analysis of the record in Judge McAnany's opinion reflects there was substantial evidence supporting the decision by the City Council and no evidence that the decision was arbitrary or capricious.

By imposing the hard look standard, the majority contravenes express legislative direction by adopting a review standard from federal environmental law rather than K.S.A. 60-2101. I would overrule *Reiter*'s adoption of the hard look test, and I dissent from our court's continued application of a different standard for historic preservation cases than applies in other types of appeals.

*Statutory Analysis*

The majority today has rewritten the Historic Preservation Act by imposing obligations on the City of Topeka that are found nowhere in the law, and it has ignored or disregarded regulations which do not fit within its analysis.

The legislature recognized there would be disagreements between proponents, opponents, and the SHPO. In those cases, the governing body of the political subdivision, here the elected representatives on the City Council, is entrusted to determine from the information presented whether to approve the proposed project. The relevant statutory language is quoted by the majority: "[T]he project shall not proceed until 'the governing body of the political subdivision . . . has made a determination, based on a consideration of all relevant factors, that there is no feasible and prudent alternative to the proposal and that the program includes all possible planning to minimize harm to such historic property resulting from such use.'" 297 Kan. at 1132 (quoting K.S.A. 2012 Supp. 75-2724[a][1]).

The quasi-judicial obligation of the City Council is plain—it is to make a determination. However, on the basis of the foregoing statute, the majority holds:

"The duty of *establishing* whether alternatives exist and whether those alternatives are feasible and prudent rests at all times with the governing body under K.S.A. 2012 Supp. 75-2724(a). To properly discharge that duty, a governing body cannot sit back and passively wait for members of the public to present it with evidence regarding potential alternatives and the feasibility of those alternatives. Nor can the governing body approve a project without making its own inquiries—

if members of the public have not fully presented it with the information needed to make the decision." (Emphasis added.) 297 Kan. at 1136.

In so finding, the majority has transformed the City Council's statutory quasi-judicial obligation of *determining* whether there are reasonable and prudent alternatives into an evidentiary burden of *establishing* whether reasonable and prudent alternatives exist.

The majority places the evidentiary burden on the City Council because, in its view, the City, with a traffic engineering division and planning department at its disposal, "was in the best position to furnish its Council with the information needed." 297 Kan. at 1136. The majority may be correct in its observation, but the Historic Preservation Act does not place the burden of presenting evidence on the City Council. Among the practical consequences of today's majority opinion is the imposition of a financial burden on the City Council to compile technical, design, and economic information for each suggested alternative. One of the suggested alternatives here is a parking garage. Setting aside the irony of that suggestion in light of the majority's reliance on *Society Hill* (where it was alleged a parking garage would impair the historic quality of a neighborhood), what level of technical, design, and economic detail is the City Council obligated to obtain before it is authorized to determine whether a parking garage is feasible? A further complication is that the City Council will be unable to render a decision at any hearing in which someone suggests an alternative because the City Council is required by this decision to undertake an investigation.

The legislature authorized the SHPO, not this court, to create rules and regulations to implement and administer the Act. See K.S.A. 75-2721(b). Those regulations appear at K.A.R. 118-3-1.

The regulations define "relevant factors" to mean "pertinent information submitted by project proponents or project opponents in written form, including evidence supporting their positions." K.A.R. 118-3-1(j). Because the City Council's obligation under K.S.A. 2012 Supp. 75-2724(a)(1) is to make a determination based on relevant factors, and relevant factors consist of the information presented by proponents and opponents, then plainly those parties

have an obligation to present the information which must be considered. Yet, in disregard of the above regulation, the majority holds that the Court of Appeals erred by placing the burden of presenting evidence of relevant factors on the proponents and opponents of the project. It is the City Council's obligation to consider all relevant factors in making its determination; by definition, that evidence comes from the proponents and opponents of the project. The City Council is not statutorily obligated to independently search for or create evidence.

The quasi-judicial function performed by a City Council under K.S.A. 2012 Supp. 75-2724(a)(1) is not far removed from the adjudicatory role of courts. A court does not perform its own investigation of the underlying facts, and similarly, nothing in the Act requires the City Council to do so when deciding whether to approve a project. As frustrating as it may seem, the City Council can essentially do what the majority finds objectionable, which is to "sit back and passively wait for members of the public to present it with evidence regarding potential alternatives and the feasibility of those alternatives." 297 Kan. at 1136. It can do so because that is the nature of its responsibility under the statutory scheme established by the legislature.

The only reference in the Historic Preservation Act to an "investigation" is in K.S.A. 2012 Supp. 75-2724(a) and (c). Under those sections, the SHPO is provided the *opportunity* to investigate the project. Failure of the SHPO to initiate an investigation within 30 days constitutes approval of the project under K.S.A. 2012 Supp. 75-2724(c). The Historic Preservation Act does not *require* an investigation of a project by anyone.

Finally, the majority's observation of the absence of evidence of technical, design, and economic considerations is only partially correct. The Church submitted its common-sense view and facts relating to technical issues, design, and economic issues. The project opponents, however, failed to present any significant information bearing on these factors. Under K.S.A. 2012 Supp. 75-2724(a)(1) and K.A.R. 118-3-1(j), it was the responsibility of the City Council to consider the pertinent information submitted by the proponents and opponents. The failure of one side to present evidence is not

a reason to fault the City Council. It performed its obligation by considering the evidence which was presented. The Court of Appeals majority opinion reflects the reality that the Church's evidence supported the City Council's decision.

For the foregoing reasons, I respectfully dissent.